# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
October 9, 2026

Thomas B. Plunkett, III
Clerk

---

No. 23-50541

---

Michelle Evans,

*Plaintiff—Appellant*,

*versus*

Jose Garza, *in his official capacity as Travis County District Attorney*,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:23-CV-727

---

ON PETITION FOR REHEARING EN BANC

Before Richman, Oldham, and Ramirez, *Circuit Judges*.

Per Curiam:

The petition for rehearing en banc is DENIED because, at the request of one of its members, the court was polled, and a majority did not vote in favor of rehearing (Fed. R. App. P. 40 and 5th Cir. R. 40).

In the en banc poll, 7 judges voted in favor of rehearing (Judges Jones, Willett, Ho, Duncan, Engelhardt, Oldham, and

Wilson), and 10 voted against (Chief Judge Elrod and Judges Smith, Stewart, Richman, Southwick, Haynes, Graves, Higginson, Douglas, and Ramirez).

Priscilla Richman, *Circuit Judge*, concurring in the denial of rehearing en banc:

I write to focus on what is, and is not, at issue. The statute under scrutiny made it a crime to disseminate a photograph of a person in a restroom under certain circumstances. The photo that Michelle Evans tweeted[1] undoubtedly punctuated her political speech that accompanied the photo. But Michelle Evans could have conveyed her political views without publishing the photo. The Texas statute did not impinge at all on Evans's ability to broadcast to the world that she saw a biological male who is transgender, and who was also a political candidate, use a women's public restroom at the Texas Capitol complex, and to express her strong political views that this should not be permitted.

The question is whether it is likely (since we are at the preliminary injunction stage) that a state has a compelling interest in protecting a person's expectation of privacy in a restroom that is sufficient to outweigh First Amendment free speech rights under the facts of this case. I submit that the answer is "yes."

Evans attended a debate in the Texas House of Representatives at the Texas Capitol about gender reassignment treatment for children. When she visited the women's restroom, she encountered a biological male who is a transgender female, and who was at the time running for election to the Texas House of Representatives. Texas law did not prohibit a biological male who identifies as a female from using a women's restroom. Evans confronted this person after they had both exited the restroom. Evans then returned to her seat in the Capitol gallery, where one of her seatmates showed her that

[1] Although Twitter has since rebranded as "X" and a "tweet" is now known as a post, I use the relevant monikers at the time of the underlying events in this case.

someone else from their group had posted on Facebook a photo of the candidate washing their hands in the women's restroom. Evans posted the photo on Twitter with a caption:[2]

**Michelle Evans**
@ThinkerMichelle

I'm sure it won't be the last time today, but just had to tell this man to stop using the women's restroom at the Capitol. There are young girls here on school field trips. Take your delusion and fetish TF out of our spaces. #TransWomenAreMen #ProtectFemaleSpaces #txlege



11:18 AM · May 12, 2023 · **1.6M** Views

[2] Michelle Evans (@ThinkerMichelle), X (May 12, 2023, at 11:18 AM), https://tinyurl.com/38tpr9am.

Evans's tweet generated a controversy, and the Travis County District Attorney, José Garza, investigated whether Evans had violated Texas Penal Code § 21.15(b). This statute criminalized—as a state jail felony[3]—transmitting "a visual image of another in a bathroom or changing room" or promoting such a transmission if the action is done without consent and "with intent to invade the privacy of the other person."[4] The statute was amended in 2025, and the relevant provisions that were in effect at the time of Evans's tweet are set forth below,[5] as well as the amended portion.[6]

---

[3] *See* Tex. Penal Code § 12.35.

[4] Prosecution of the Offense of Invasive Visual Recording, 84th Leg., R.S., ch. 954, § 4, 2015 Tex. Gen. Laws 3394, *amended by* Act of May 16, 2025, 89th Leg., R.S., H.B. 1465, § 3 (codified at Tex. Penal Code § 21.15(b)).

[5] *Id.*, providing:

> (b) A person commits an offense if, without the other person's consent and with intent to invade the privacy of the other person, the person:
>
> * * *
>
> (2) photographs or by videotape or other electronic means records, broadcasts, or transmits a visual image of another in a bathroom or changing room; or
>
> (3) knowing the character and content of the photograph, recording, broadcast, or transmission, promotes a photograph, recording, broadcast, or transmission described by Subdivision (1) or (2).

[6] Act of May 16, 2025, 89th Leg., R.S., H.B. 1465, § 3 (codified at Tex. Penal Code § 21.15(b)) (emphasis added), which states:

> (b) A person commits an offense if, without the other person's consent and with intent to invade the privacy of the other person, the person:
>
> * * *

Evans has not been prosecuted, but she sought a temporary restraining order and preliminary injunction in federal court prohibiting Garza from investigating or prosecuting her based on her dissemination of the photograph. She argues Texas Penal Code § 21.15(b)(2)-(3) is unconstitutional on its face and as applied to her past and future publication of the photograph based on her First and Fourteenth Amendment rights. The district court denied Evans's motions for injunctive relief.

At issue is subsection (b)(2) of the statute in effect on the date of the incident. Subsection (b)(2) is limited to images "of another in a bathroom or changing room."[7] An element of the offense is that the image is taken or disseminated with the intent to invade the person's privacy.[8] To sustain her overbreadth challenge, Evans must "demonstrate from the text of [the statute] and from actual fact that a substantial number of instances exist in which the Law cannot be applied constitutionally."[9]

Circumstances in which a prosecution under the Texas law would likely be constitutional readily come to mind. For example, it is highly unlikely that there is a First Amendment right to distribute, without their consent, images of a person's genitalia (whether they be an adult, infant, pre-

---

> (2) photographs or by videotape or other electronic means records, broadcasts, or transmits a visual image *of another person in a place in which a person has a reasonable expectation of privacy;* or
>
> (3) knowing the character and content of the photograph, recording, broadcast, or transmission, promotes a photograph, recording, broadcast, or transmission described by Subdivision (1) or (2).

[7] Prosecution of the Offense of Invasive Visual Recording, 84th Leg., R.S., ch. 954, § 4, 2015 Tex. Gen. Laws 3394 (amended 2025).

[8] *Id.*

[9] *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988).

teen, or teen) while utilizing bathroom facilities. Evans is not likely to succeed on her claim that the statute is facially invalid.

In support of her as-applied claim, Evans maintains that when the subject of the photograph is "not in a private area of the bathroom and knows they are subject to public view," specifically, when they are "fully clothed, at a sink, washing their hands," others in the restroom have a First Amendment right to photograph the subject, and Evans has a First Amendment right to distribute that photograph. The question is whether the State has an interest in protecting the privacy of those using public restrooms that is sufficient to survive strict scrutiny when the person is photographed fully clothed washing their hands.

No one disputes that a person has a privacy interest not to be photographed in their own home without their permission, certainly not when the intent is to use the photograph to invade the person's privacy.[10] But what happens when a person leaves their home and enters public spaces in a government building? When nature calls, it is unrealistic to think that the person can make it back home to use their own bathroom (which may be in another city or state) or find some other private restroom.

---

[10] *See generally Kyllo v. United States*, 533 U.S. 27, 37, 40 (2001) (holding that thermal-imaging surveillance of a house was a search, rejecting the government's argument that "thermal imaging was constitutional because it did not 'detect private activities occurring in private areas'"); *id.* at 37 (recognizing the Fourth Amendment's protection against prying into "intimate details," stating that "[i]n the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes"); *Dow Chem. Co. v. United States*, 476 U.S. 227, 236 (1986) (holding that the EPA's aerial photographs of a plant complex was not an unconstitutional search, acknowledging that "[t]he intimate activities associated with family privacy and the home and its curtilage simply do not reach the outdoor areas or spaces between structures and buildings of a manufacturing plant").

A public restroom has been considered as a practical matter "off limits" to the press once someone crosses its threshold. Traditionally, neither a private citizen nor the press follows a person into a restroom to pursue questioning or to obtain photographs. That is considered, as a matter of tradition, "beyond the pale." Evans argues, though, that in the case before us, the person who was photographed had left the privacy of a stall to use the sink and therefore should be fair game. This would allow people engaged in a number of activities outside restroom stalls to be photographed without their consent. Outside the confines of a stall, people attend to all sorts of personal needs. Mothers change babies' diapers or nurse them. People adjust clothing or undergarments or change outfits entirely. They dab water on spills on their clothing, perhaps taking off a blouse or shirt or trousers, or hiking up a skirt. Some public bathrooms have sitting areas with couches or other lounge furniture in case a person feels the need to lie down. Do these activities outside a stall subject people to being photographed without their consent, including surreptitiously, as long as certain body parts are not visible? Is there no constitutional protection when the photograph is taken or disseminated with the intent to invade the privacy of the person?

Does the constitution draw the line at the door to a stall in a women's or men's restroom for purposes of photographing someone? Does the First Amendment require that, once a person exits a stall, mobile phones and cameras may come out? As to urinals, does the First Amendment say cameras can click once the pants or trousers are zipped? Can the press or anyone seeking to photograph celebrities or public figures or other persons of interest enter or even crowd the restrooms of public buildings waiting for the chance to capture the moment the targeted person enters or exits a stall or turns away from a urinal? What of the ordinary person who is also in the restroom and of no interest to the press or to a private citizen on a politically

motivated mission? Must the non-targeted individual navigate the press or other photo seekers?

The Texas Legislature reached the considered judgment that everyone, be it the Governor, a member of the Texas House or Senate, a state or federal judge, a political activist, a tourist, or a child, should have protection from being photographed without their consent when in a restroom, when the intent is to invade their privacy. This is a substantial, legitimate state interest. Evans is not likely to succeed on her claim that strict scrutiny requires states to draw the line at the point when a person has left a stall or finished using a urinal or might otherwise have ceased to be in a position in which their genitalia would be visible. A public restroom in a government building is analogous to a bathroom in one's home. It is a place that sometimes must be frequented to attend to bodily functions that cannot be ignored and to attend to other personal matters normally addressed in a restroom. To say that a person has an expectation of freedom from being photographed only when that person's genitalia might be exposed would confine the right to privacy and seclusion too narrowly.

James C. Ho, *Circuit Judge*, dissenting from the denial of rehearing en banc:

Our court has an unfortunate record when it comes to combating the weaponization of law enforcement and protecting the First Amendment right to express views disfavored by those in power. *See*, *e.g.*, *Villarreal v. City of Laredo*, 94 F.4th 374 (5th Cir. 2024), *reaff'd*, 134 F.4th 273 (5th Cir. 2025); *Mayfield v. Butler Snow*, 78 F.4th 796 (5th Cir. 2023); *Gonzalez v. Trevino*, 60 F.4th 906 (5th Cir. 2023).

So today's order should surprise no one. Indeed, if the privacy theories credited by our court in *Villarreal* were sufficient to justify Priscilla Villarreal's arrest and prosecution, *see* 94 F.4th at 387, then it's no wonder that the government's privacy theories were credited by the panel majority here as well. *See Evans v. Garza*, 161 F.4th 315, 321–22 (5th Cir. 2025). *But see id.* at 327–28 (Oldham, J., dissenting).

Observers of our court would undoubtedly code Villarreal's speech as "liberal," and Michelle Evans's speech as "conservative." But of course, that's been my precise point in all of these cases. We're supposed to apply the same constitutional protections to every citizen, whether we agree with their views or not. We're supposed to protect the freedom of speech no matter whose ox is gored. *See*, *e.g.*, *Villarreal*, 94 F.4th at 412 (Ho, J., dissenting) (same First Amendment standards should apply to conservatives and liberals); *Oliver v. Arnold*, 19 F.4th 843, 844 (5th Cir. 2021) (Ho, J., concurring in the denial of rehearing en banc) (same); *Ford v. Mckesson*, 184 F.4th 448, 449 (5th Cir. 2026) (Ho, J., concurring in the denial of rehearing en banc) (same); *Perez v. City of San Antonio*, 168 F.4th 345, 346 (5th Cir. 2026) (Ho, J., dissenting from the denial of rehearing en banc) (same First Amendment standards should apply to the Lipan-Apache and evangelical Christianity).

## I.

"If any principle of constitutional law ought to unite all of us as Americans, it's that the government has no business imprisoning citizens for the views they hold." *Villarreal*, 94 F.4th at 412 (Ho, J., dissenting). "So it's gratifying that a diverse amicus coalition of nationally recognized public interest groups . . . stands firmly behind Villarreal." *Id.* *See also McMurry v. Weaver*, 142 F.4th 292, 305 (5th Cir. 2025) (Ho, J., concurring) ("A broad coalition of leading civil rights and religious liberty organizations . . . have called our en banc decision in *Villarreal* 'insidious' and 'dangerous.'").

A number of those amici no doubt "disagree with Villarreal on a wide range of issues." *Villarreal*, 94 F.4th at 412 (Ho, J., dissenting). "But although they may detest what she says, they all vigorously defend her right to say it." *Id.* Their "united front gives me hope that, even in these divided times, Americans can still stand up and defend the constitutional rights of others—including even those they passionately disagree with." *Id.*

"Americans are a diverse and passionate bunch. That is a feature of our country, not a bug." *Oliver*, 19 F.4th at 854 (Ho, J., concurring in the denial of rehearing en banc). "But if we can't debate (or even tolerate) one another—if this is where our national culture is going—then we are headed for an ideological arms race, one in which each side in any major debate will escalate every grievance and deploy every tool at their disposal to suppress their opponents. And I fear that, as our Founders predicted, we will all be worse off as a result." *Id.*

After all, it's not popular speech that needs protection. "It's only when speech is unpopular that you need the First Amendment." *Hershey v. Bossier City*, 165 F.4th 292, 292 (5th Cir. 2025) (Ho, J., concurring in the denial of rehearing en banc). And as sure as the day is long, every American can count on the fact that, someday, somewhere, some view you hold dearly

will be disdained and devalued by the majority of the community—and that you may need the First Amendment to protect you.

**II.**

In response to the dissents, the concurring opinion helpfully (if not ironically) publishes the allegedly criminal photo at issue in this case. It does so in an apparent effort to dramatize the purported privacy violation that supposedly justifies the criminalization of speech. In doing so, however, the concurrence only dramatizes the First Amendment violation in this case.

I'll begin with a few preliminary points.

First off, the concurrence invites Evans to "convey[] her political views without publishing the photo." But not only is that contrary to bedrock First Amendment law—which protects images as well as words. It's also contrary to the concurrence itself. After all, the concurrence (like Michelle Evans!) chose to publish the photo—presumably because the concurrence *agrees with Evans* that adding images to words does indeed help to "punctuate[]" their message.

Second, the concurrence argues that we should limit the First Amendment to the "tradition[s]" of the "press." This is wrong on multiple levels. To start, the First Amendment (obviously) protects speech whether it's favored or disfavored by the media. Moreover, if press traditions actually mattered to the court, then we presumably would have protected the highly traditional press practice of directing questions to "backchannel" sources, as well as designated press secretaries. Yet our court did precisely the opposite in *Villarreal*. *See* 94 F.4th at 389, 398 (condemning use of "backchannel" sources); *see also id.* at 420 (Ho, J., dissenting) (noting that judges as well as journalists regularly seek "non-public information from a 'backchannel source'—for example, from a Senate aide who has information about . . . a pending judicial nomination").

## III.

But perhaps the most important message to draw from the concurrence's publication of the photo is this: The photo confirms that there's no actual violation of privacy here.

After all, the photo depicts the individual in question in precisely the same way that that person chooses to present himself in public. So if that's a violation of privacy, then we have truly lost all understanding of the word.

And we have indeed lost all understanding of privacy. For let us not miss the profound irony here: A man enters a women's bathroom—and it's the *man's* privacy that is violated?

To borrow from the concurrence: Mothers must "nurse [their babies]," and women must "adjust [their] undergarments," "tak[e] off a blouse," or "hik[e] up a skirt," in the presence of any man who claims he is a woman—and if a woman objects, *she's* the one who is violating *his* rights?

The entire point of Evans's message, of course, is that it's a violation of *women's* privacy for a *man* to be present in a women's bathroom. So we're turning the law upside down to suggest that men have a privacy right to enter a women's restroom—and women have no First Amendment right to object.

Today's order is just the latest evidence that our judicial system gets things exactly backwards. In the olden days, the law would protect Evans's message—and it's the man's presence in the women's bathroom that would be considered the violation. But under the precedent we leave intact today, there's no First Amendment protection for the women—it's the man's presence in the women's bathroom that we must protect instead—and it's the women who must not resist too boldly or else go to jail.

* * *

I'm well aware that today's decision captures the cultural zeitgeist of societal elites. Just a few months ago, the Supreme Court used a female pronoun to describe the male plaintiff in the caption of its decision in *West Virginia v. B.P.J.*, 609 U.S. _ (2026). This despite the fact that neither West Virginia nor B.P.J.'s ACLU counsel used a female pronoun in their captions—the parties adopted a policy of neutrality and avoided using either pronoun. (Nor can the *B.P.J.* caption be explained by a practice of deference to the court of appeals. *Compare*, *e.g.*, *Sossamon v. Texas*, 563 U.S. 277 (2011), where the Court used the caption adopted by the parties instead of the court of appeals.)

The Court's use of transgender pronouns in its official caption is striking. Other courts, by contrast, have continued to follow history and tradition when it comes to pronouns. *See*, *e.g.*, *Gibson v. Collier*, 920 F.3d 212, 217 n.2 (5th Cir. 2019); *United States v. Varner*, 948 F.3d 250 (5th Cir. 2020); *see also Defending Education v. Olentangy Local School District Board of Education*, 158 F.4th 732, 786 & n.36 (6th Cir. 2025) (Bush, J., concurring).

My ultimate point here, however, is not to debate whether we should follow neutrality, history and tradition, or transgender ideology when it comes to pronouns. My point, rather, is simply this: As Americans, we're allowed to object, and we're allowed to dissent.

Justice Thomas has observed that "[m]en . . . are not women . . . , even if they believe that they are." *B.P.J.*, 609 U.S. at _ (Thomas, J., concurring). And to claim otherwise is to "show indifference regarding the truth." *Id.* (quotations omitted). If the First Amendment protects nothing else, it protects the right of every American to express the truth. So I'm grateful to have this opportunity to dissent. I only regret that we could not extend that same privilege to Michelle Evans.

Andrew S. Oldham, *Circuit Judge*, joined by Jones, Willett, Ho, Duncan, and Engelhardt, *Circuit Judges*, dissenting from the denial of rehearing en banc:

Travis County District Attorney Garza wanted to prosecute Michelle Evans over a tweet. *Cf.* Rhys Groen, *Pakistan Human Rights Lawyers Imaan Mazari and Hadi Chattha Sentenced to 17 Years Over Social Media Posts*, Jurist News (Jan. 25, 2026), https://perma.cc/Z4VY-33EC; *Hanson v. Faruqi* [2026] FCAFC 96 (27 July 2026) (Austl.). Never mind that the tweet constituted political speech. And never mind that criminally charging social-media users for core political speech is tragicomically unconstitutional in this country. DA Garza waged a years-long battle over his right to do so anyway.

Then on the eve of possible en banc rehearing, Garza waved the white flag. With all the tact of a Kafkaesque bureaucrat, Garza blithely informed the court that "previously gathered evidence was not retained," that the limitations period has now run, and that "the office will make arrangements for releas[ing]" Evans's confiscated phone. Appellee Letter to Ct., June 15, 2026, Dkt. 106. That assurance of mootness apparently sufficed to defeat the en banc poll.

But it did not vacate the panel opinion in this case. *But see United States v. Munsingwear, Inc.*, 340 U.S. 36, 39–41 (1950); S. Shapiro, K. Geller, T. Bishop, E. Hartnett, & D. Himmelfarb, Supreme Court Practice § 19.5 (11th ed. 2019). Nor did it give future would-be speakers in Austin any assurance that they can participate freely in public policy debates without worrying about ham-fisted local prosecutors who'll abuse state law to suppress conservative speech. Kafka's Inspector said, "I can't even confirm that you are charged with an offense, or rather I don't know whether you are. You are under arrest certainly, more than that I do not know." Franz Kafka, The Trial 16–17 (1956 ed.). That was not supposed to be an instruction manual.